UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHAREEF ABDOU,

                                 Plaintiff,

                -v-

BRIAN MAHANY, et al.,

                            Defendants.

19 Civ. 1824 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

Shareef Abdou ("Abdou") was a successful plaintiff and relator in a *qui tam* action brought on behalf of the United States against his former employer, a nationwide bank, for violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, relating to the bank's mortgages practices. The case settled for $300 million. Abdou was represented in the action by the defendants here: the law firm of Mahany Law and Mahany & Ertl, LLC (together "Mahany Firm") and individual attorneys Brian Mahany ("Mahany"), Joseph Bird ("Bird"), and Anthony Dietz ("Dietz"). On defendants' advice, Abdou accepted a 16% relator share, which entitled him to an award of $48 million. The Mahany Firm represented Abdou on a contingency basis in the *qui tam* action. The parties had initially contracted for the firm to receive a 40% contingency fee; this fee was renegotiated multiple times. Ultimately, of the $48 million award, Abdou received approximately $32 million, and the firm received more than $15 million in fees.

Abdou now brings claims against defendants for breach of fiduciary duty, professional negligence, breach of contract, and unjust enrichment. Abdou asks the Court to exercise its inherent power to reduce defendants' fee award. Defendants have each moved to dismiss the

Second Amended Complaint ("SAC").  For the following reasons, the Court grants each motion in part and denies it in part.

## I.     Background

### A.     Factual Background[1]

In 2013, Abdou was employed as a mid-level executive in the operations group of a nationwide bank (the "Bank").[2]  SAC ¶¶ 2, 28.  Abdou, who holds an MBA from the University of California, Los Angeles, was working in the Bank's offices in Calabasas and Westlake, California when he observed practices that he believed were improper.  *Id.* ¶¶ 27–28.  After Abdou's attempts to correct these practices through official channels at the Bank proved unsuccessful, he decided to hire an attorney.  *Id.* ¶ 29.  A coworker informed Abdou that a Milwaukee law firm was looking for whistleblowers with information on "toxic mortgages" issued by the Bank.  *Id.* ¶¶ 30–31.  Abdou searched for the firm online and found the Mahany

---

[1] This factual account draws primarily from the SAC, Dkt. 39, and attached exhibits cognizable on this motion.  *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss . . . a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").  For the purpose of resolving the motion to dismiss, the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of the plaintiff.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

The SAC does not attach a copy of the Relator Settlement agreement.  Dkt. 54-2 ("Relator Settlement").  However, the SAC relies on the terms and effect of the Relator Settlement, and the Relator Settlement was clearly before Abdou when drafting the SAC.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." (cleaned up)).

[2] The SAC does not name the Bank, but Exhibit A to the SAC identifies it as Bank of America.  *See* SAC, Ex. A ("Aug. Ltr.") at 1.

Firm,[3] a Wisconsin-based firm seeking to represent Bank employees on a contingency basis, which advertised that it represented the "whistleblower in the largest pending federal false claims act case anywhere in the United States against a lender." *Id.* ¶¶ 30–31. The firm's website also claimed that, "[o]n average, whistleblowers receive 20% of whatever is collected by the government." *Id.* ¶ 31.

Abdou contacted the Mahany Firm and, in July 2013, spoke by phone with Bird, who outlined Abdou's potential claims under the FCA and the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), 12 U.S.C. § 1831j. *See id.* ¶¶ 32–33. The parties entered into a retention agreement in July 2013. *Id.* ¶ 33. The SAC does not attach or provide any details about this agreement.

On August 2, 2013, Mahany sent Abdou a letter with the subject line "REVISED Legal Representation Agreement." *Id.* ¶ 35; Aug. Ltr. The August Letter covered three types of claims: (1) FCA claims; (2) retaliation claims against the Bank; and (3) possible future claims. *See* Aug. Ltr. The August Letter contemplated a 40% contingency fee for sums recovered (net of costs) from the FCA claims, and also entitled the Mahany Firm to recover its costs from any FCA award. *Id.* at 2. The Mahany Firm also agreed to represent Abdou in ancillary claims arising out of his employment with the Bank, such as retaliation claims, in exchange for a 25% contingency fee net of costs. *Id.* Finally, the August Letter provided that the Mahany Firm would represent Abdou in future claims developed from the investigation of Abdou's information for a 33 1/3% contingency fee, but explained that any such claims would require a

---

[3] At the time Abdou initially hired the Mahany Firm, it operated under the name Mahany & Ertl, LLC. On August 25, 2015, Mahany & Ertl, LLC was dissolved, and Mahany began operating his firm under the name Mahany Law. SAC ¶ 75.

separate retainer. *See id.* at 3. The Mahany Firm reserved the right to terminate its representation of Abdou if, after investigation, it found that Abdou had no viable claims or if it determined "the case not [to] be economically viable and after an unfavorable investigation by the federal government." *Id.* at 3–4. The Mahany Firm could also terminate its representation of Abdou "if in the firm's judgment, continued representation is impossible, inadvisable or if [Abdou] ask[ed] [the firm] to do something illegal or unethical." *Id.* at 4. Abdou, in turn, was empowered to terminate the agreement at any time, but if he did so without just cause, he would be responsible for "the reasonable value of [the firm's] services provided through the date of termination." *Id.* "Unless [Abdou] arbitrarily and without good cause elect[ed] to terminate representation and withdraw [his] claims, [Abdou was] never indebted to the firm for any of the services provided by the firm under this contract unless the firm obtain[ed] a recovery." *Id.* at 1–2.

The August Letter stated that the Mahany Firm's performance was governed by the "laws of the state of Wisconsin and the regulations governing attorneys practicing in Wisconsin, as promulgated by the Supreme Court of Wisconsin" and the "multijurisdictional rules of practice of the American Bar Association." *Id.* at 4. The August Letter did not advise Abdou that he had the right to have the agreement reviewed by independent counsel. The agreement also recited that the Mahany Firm had "advised [Abdou] that while being investigated by the government and while under court seal, [he] may not discuss this case with others," although he should continue to cooperate with the government with guidance from counsel. *Id.*

On October 25, 2013, Mahany, on behalf of the Mahany Firm, sent Abdou a letter with the subject line "Second Revision to Legal Representation Agreement FIRREA Claims." SAC ¶ 42; *id.*, Ex. B ("Oct. Ltr."). The letter stated that Abdou and the Mahany Firm had agreed to reduce the contingency fee as to the FIRREA claim from 40% to 33%. Oct. Ltr. The October

Letter also stated that "all other terms of the August 2nd representation agreement remain unchanged." *Id.* At the time, no FIRREA claim had been filed, and Abdou ultimately recovered only under his FCA claim. SAC ¶¶ 42, 54–55.

Abdou alleges that the firm did limited work on his behalf. He alleges that defendants instructed him to begin drafting his own complaint. *Id.* ¶ 43. With some input from Bird but otherwise minimal involvement of the defendants, Abdou alleges, he drafted his own complaint with a FIRREA claim, which would allow him to remain anonymous. *Id.* Defendants worked on Abdou's employment claims, including his separation from the Bank. *Id.* Defendants negotiated a temporary leave of absence on Abdou's behalf, which was extended several times. *Id.* ¶ 44. The SAC alleges that this task required "minimal" work on defendants' part. *Id.* Defendants "passive[ly]" participated in phone calls and emails relating to Abdou's case; Abdou, in contrast, actively worked with the Department of Justice ("DOJ"), *id.* ¶ 45, providing DOJ with information and documentation of improper practices at the Bank and assisting DOJ in preparing subpoenas. *Id.*

In fall 2013, DOJ informed Abdou that the government planned to file a lawsuit against the Bank and that, to recover as a relator under the FCA, Abdou needed to file an FCA action immediately. *Id.* ¶ 46. Abdou then began editing his complaint to bring a claim under the FCA, rather than under FIRREA. *Id.* ¶ 47.

The SAC alleges that, on or about January 13, 2014, Abdou spoke with Bird, who agreed that "recovery under the FCA should be subject to the same fee agreement to which the parties had agreed for the FIRREA claim." *Id.* ¶ 48. Bird allegedly told Abdou that he would speak to Mahany and "send a revised agreement reflecting [those] terms." *Id.*

On January 14, 2014, Abdou filed his *qui tam* action in this District. *See United States ex rel. Abdou v. Countrywide Fin. Corp.*, No. 14 Civ. 268 (AKH) (S.D.N.Y. filed Jan. 14, 2014). The SAC alleges that the complaint was "substantially the same as the version Mr. Abdou had drafted." SAC ¶ 49. On January 15, 2014, Abdou spoke with defendants by phone about their fee arrangement. *Id.* ¶ 50. After this call, on January 16, 2014, Mahany sent an email to Abdou with the subject "Fee Amendment & Clarification." *Id.*, Ex. C ("Jan. Email"). The email apologized for confusion regarding the fees and stated that "[a]ll the terms of the original fee agreement dated remain [sic] in full force and effect except" that the "contingent fee on any False Claims Act recovery shall be further reduced from 40% to 33 1/3%." Jan. Email. The January Email reflected the following fees:

> a) False Claims Act (33 1/3%)
> b) FIRREA claim (33 1/3%)
> c) Third party claims (33 1/3%)
> d) Employment / retaliation claims (25%)

*Id.* The January Email further requested that, if this "comport[ed] with [Abdou's] recollection of [the parties'] discussion," Abdou respond to the email "indicating acceptance." *Id.* Approximately 15 minutes later, Abdou responded "Confirmed. Thanks Brian." *Id.* The SAC alleges that after this discussion, defendants did not work on the FCA suit at all and waited to see whether DOJ would intervene. SAC ¶ 51.

DOJ conducted a broad investigation into the Bank's conduct. *Id.* ¶ 52. In August 2014, it reached a tentative global settlement with the Bank for $16.65 billion, $300 million of which would be allocated to settle Abdou's *qui tam* action. *Id.* DOJ initially advised Abdou that the loans at issue in his case might be barred by the statute of limitations, which would limit him to recovery under FIRREA. *Id.* ¶ 53. However, the SAC alleges, Abdou, unassisted by defendants, conducted legal research and convinced defendants and DOJ that liability under the FCA was

proper. *Id.* ¶ 54. Even so, to finalize the settlement, Abdou and DOJ still needed to reach an agreement regarding the size of Abdou's relator share. *Id.* ¶¶ 55–56. Defendants had represented to Abdou that a 20% share was typical, but DOJ offered Abdou only 15%. *Id.* ¶¶ 56–57. Defendants allegedly encouraged Abdou to accept this offer, but Abdou, on his own, researched the factors that DOJ normally considers in determining the size of a relator share and told defendants of his analysis. *Id.* ¶ 58. Defendants then requested a higher award from DOJ. *Id.* In response, DOJ offered 16%. *Id.* ¶ 59.

Defendants, but especially Bird and Mahany, "pressure[d]" Abdou to accept this award without delay. *Id.* ¶¶ 59–60. Abdou requested to delay the agreement to the following year for tax purposes. *Id.* ¶ 60. Defendants offered to discount their fees by $375,000 if Abdou settled in 2014. *Id.* Bird and Mahany allegedly began "pressuring" Abdou to accept the 16% award, lest he receive no award at all. *Id.* ¶ 61. Abdou told defendants that he would accept 16% but only if not doing so meant that he would forfeit any award. *Id.* The SAC alleges that Bird, on Abdou's behalf, ignored these instructions and accepted the 16% award on Abdou's behalf. *Id.* ¶ 62. Abdou felt at this point that he "had no choice" but to accept the 16% relator share. *Id.* ¶ 63. He then entered into a final agreement with DOJ that so provided. *Id.*

On December 15, 2014, Judge Hellerstein unsealed the docket of Abdou's *qui tam* action and entered an order dismissing the case with prejudice pursuant to the global settlement, which allocated Abdou a 16% award of the $300 million portion of the global settlement assigned to his case, *i.e.*, an award of $48 million. *Id.* ¶¶ 64–65. The relator share funds were distributed to defendants, who deducted $16 million minus the previously agreed upon $375,000, and returned the remaining funds to Abdou. *Id.* ¶ 65. Of the sum it received, the Mahany Firm distributed $5,208,333.34 to Mahany, $5,208,333.34 to Bird, and $1,450,000.33 to Dietz. *Id.* On January 5,

2015, the Mahany Firm distributed an additional $3,758,333 to Dietz. *Id.* Defendants also

negotiated a statutory award of $300,000 in attorneys' fees. *Id.* ¶ 67. The SAC alleges that

defendants intended to request $100,000, but that Abdou encouraged them to request more. *Id.*

Negotiations for Abdou's separation from the Bank were less successful. *Id.* ¶ 68. Bird

allegedly described Abdou as "unreasonable" to the Bank and otherwise "began denigrating"

Abdou. *Id.* ¶¶ 68–69. Bird allegedly insulted Abdou when Abdou asked for more information

about the circumstances of the settlement. *Id.* ¶ 69. Among other insults, Bird accused Abdou of

having a "sickness" and needing "counseling." *Id.* ¶¶ 69–70.

Despite these allegations, on May 8, 2015, defendants entered into another agreement

with Abdou to represent him in connection with possible other FIRREA and FCA claims that he

may have. *Id.* ¶ 71; *id.*, Ex. D ("May Ltr."). The May Letter obligated the firm to investigate

whether Abdou had any other viable FCA or FIRREA claims against the Bank. *Id.* ¶ 72. For

FCA claims, the Mahany Firm would receive "28% of the first $7.5 million recovered by relator

and 20% of all sums recovered by relator in excess of $7.5 million," but if the government failed

to intervene, the "fee reduction for relator recoveries in excess of $7.5 million [would] not

apply," and the Mahany Firm would be entitled to "28% of all sums recovered." May Ltr. at 2.

For FIRREA claims, the Mahany firm would receive "33 1/3% of all sums recovered"; for any

other claims, it would receive "28% of all sums recovered." *Id.* The May Letter stated that

"[c]ertain states have special rules regarding legal fees in contingent fee cases," such as "fee

caps, mandatory disclosures and the like," that generally apply to personal cases, and stated that

because his case was on behalf of the United States, the parties agreed that it was not subject to

these rules. *Id.* at 4. The May Letter also notified Abdou that he had "a right to contact other

lawyers to discuss the terms of this agreement." *Id.* at 5.

Bird allegedly began pressuring Abdou to pay defendants additional fees and to "reimburse" the firm for the $375,000 in discounted fees. SAC ¶ 76. Bird told Abdou that he needed to return this "fee discount" if Abdou wanted to "put the relationship back where it was." *Id.* Abdou then terminated the Mahany Firm and hired new counsel. *Id.* ¶ 77. At that time, defendants had not finished negotiating Abdou's separation from the Bank. *Id.* Defendants argued that as a result of the termination, they were entitled to fees for the services they had rendered in connection with those negotiations. *Id.*

### B.    Procedural History

On October 10, 2018, Abdou filed a complaint in Wisconsin state court against the Mahany Firm and Mahany (together, the "Mahany Defendants") and Bird. Dkt. 1-1. On November 9, 2018, defendants removed the case to the Eastern District of Wisconsin. Dkts. 1, 3. On December 10, 2018, the Mahany Defendants moved to transfer the case to this District pursuant to 28 U.S.C. § 1404(a). Dkts. 15–16. Bird joined the motion to transfer. Dkt. 20. On December 21, 2018, Abdou filed an opposition. Dkt. 18. On December 26, 2018, and January 4, 2019, respectively, Bird and the Mahany Defendants filed replies. Dkts. 22–23. On January 16, 2019, Abdou's counsel moved to withdraw, as he was retiring, and to stay the case for 60 days. Dkt. 24. On January 22, 2019, defendants filed oppositions to the request to stay the case. Dkts. 26–27. On February 21, 2019, the court granted the Mahany Defendants' motion to transfer the case. Dkt. 28 ("Transfer Order"). The court also stayed the case for 60 days to permit Abdou to find replacement counsel. *Id.*

On February 27, 2019, the case was transferred to this Court. On March 11, 2019, the Court affirmed the stay to permit Abdou to retain successor counsel. Dkt. 30. On May 10, 2019, the Court held an initial pretrial conference and set a deadline for Abdou's anticipated amended complaint. Dkt. 42.

On May 24, 2019, Abdou filed the First Amended Complaint. Dkt. 44 ("FAC"). On June 7, 2019, defendants filed a letter indicating that all defendants intended to move to dismiss the FAC and asking that discovery be stayed pending resolution of the motions to dismiss. Dkt. 45. On June 11, 2019, the Court stayed deposition discovery, but permitted document discovery to proceed. Dkt. 47. On June 21, 2019, the Mahany Defendants moved to dismiss under Rule 12(b)(6). Dkt. 51. Bird separately moved to dismiss under Rules 12(b)(6) and 12(b)(7). Dkts. 52 (motion), 54 ("Bird Mem."). With respect to Rule 12(b)(7), Bird argued that Dietz, who received a portion of the contingency fee, was a necessary party. On June 26, 2019, the Court ordered Abdou to either oppose the motions to dismiss or file a second amended complaint. Dkt. 57.

On July 8, 2019, Dietz appeared and moved for leave to file an amicus brief in opposition to Bird's Rule 12(b)(7) motion. Dkt. 64. On July 9, 2019, the Court granted Dietz's motion. Dkt. 65. On July 10, 2019, Bird filed a letter opposing Dietz's motion to file an amicus brief. Dkt. 66. The same day, Dietz filed an amicus brief. Dkt. 67.

On July 15, 2019, Abdou filed the SAC, which added Dietz as a defendant. On July 19, 2019, Dietz moved for an extension of time to make initial disclosures pending the filing of his anticipated motion to dismiss, Dkt. 73, which Abdou opposed, Dkt. 77. On July 26, 2019, the Court denied Dietz's motion. Dkt. 79.

On July 23, 2019, Bird filed a letter indicating that, because Abdou had added Dietz as a defendant in the SAC, Bird was withdrawing his motion to dismiss to the extent it was based on Rule 12(b)(7) and indicating that he would rely on his previous 12(b)(6) motion. Dkt. 75 ("Bird Supp. Mem."). On August 5, 2019, Dietz and the Mahany Defendants moved to dismiss the SAC. Dkts. 82 ("Dietz Mem."), 83-1 ("Mahany Mem."). On August 6, 2019, Abdou filed his

opposition to Bird's motion to dismiss. Dkt. 84 ("Opp'n to Bird MTD"). On August 12, 2019,

Bird filed a reply. Dkt. 87 ("Bird Reply"). On August 26, 2019, Abdou filed oppositions to the

motions to dismiss. Dkts. 88 ("Opp'n to Dietz MTD"), 89 ("Opp'n to Mahany MTD"). On

September 12, 2019, the Mahany Defendants and Dietz filed replies. Dkts. 94 ("Mahany

Reply"), 95 ("Dietz Reply").

The parties proceeded with document discovery. On October 16, 2019, the Court

resolved a discovery dispute between Bird and Abdou regarding two of Bird's interrogatories

and Abdou's failure to produce certain documents related to his settlement with the Bank.

Dkt. 99. The parties received several extensions of time to complete discovery. Dkts. 105, 107,

109. On April 14, 2020, the parties filed a letter jointly requesting that, in light of the stay of

depositions, the deadlines for the close of fact and expert discovery be extended until 60 days

after resolution of the motions to dismiss. Dkt. 110. The same day, the Court granted that

request. Dkt. 111. On August 13, 2020, the Court resolved a second discovery dispute between

Abdou and Dietz regarding requests concerning Abdou's purported cognitive impairment and

documents that had been designated attorneys' eyes only. Dkt. 114.

## II.     Legal Standards Governing Motions to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough

facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where,

as a matter of law, "the allegations in a complaint, however true, could not raise a claim of

entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court

must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the

plaintiff." *Koch*, 699 F.3d at 145. That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III. Discussion

Abdou brings seven claims. These seek a refund of attorneys' fees or damages based on three theories of recovery: (1) the fee award was unreasonable and excessive in light of the limited work defendants performed; (2) defendants breached their fiduciary duties to Abdou, committed professional negligence, or breached their contract with Abdou in the negotiation and modification of the retention agreements; and (3) defendants breached their fiduciary duties to Abdou in accepting the 16% relator's award without engaging in substantial efforts to negotiate a higher percentage.

The Court first conducts a choice of law analysis to determine which state's substantive law and statutes of limitations apply to this case, and then examines these theories in turn.

### A. Choice of Law

A federal court sitting in diversity applies the substantive law of the state in which it sits, including that state's choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). But "when a case is transferred for convenience under 28 U.S.C. § 1404(a), the law of the transferor state is to be applied so long as the transferor state could properly have exercised jurisdiction." *Gerena v. Korb*, 617 F.3d 197, 204 (2d Cir. 2010); *see also Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 244 n.8 (1981) ("[W]here a case is transferred pursuant to 28 U.S.C. § 1404(a), [the court] must apply the choice-of-law rules of the State from which the case was transferred."); *Van Dusen v. Barrack*, 376 U.S. 612, 636–37 (1964) ("[B]oth the history and purposes of § 1404(a) indicate that it should be regarded as a federal judicial housekeeping

measure, . . . generally intended, on the basis of convenience and fairness, simply to authorize a change of courtrooms.").

Having found that the Southern District of New York was a more convenient venue for this case, the district judge in the Eastern District of Wisconsin transferred the case pursuant to 28 U.S.C. § 1404(a). *See* Transfer Order at 3–5. Although the transferor court did not make an explicit finding that venue was proper in the Eastern District of Wisconsin, the court's order does not suggest that venue was improper or that the court granted the motion to transfer the case to cure a defect in venue. *See id.* at 4 ("In light of these factors, it is abundantly clear that the Southern District of New York is the *more appropriate* venue for this case." (emphasis added)). Nor does the Transfer Order suggest a defect in the transferor court's personal jurisdiction over any defendant. Accordingly, because the Eastern District of Wisconsin could have properly exercised jurisdiction over the case, the Court must apply Wisconsin's choice of law rules, including its choice of law rules as to statutes of limitations.[4]

Abdou brings claims sounding in breach of contract and unjust enrichment, breach of fiduciary duty, and professional negligence.

With respect to the breach of contract and quasi-contract claims, the retention agreement that Abdou signed with the Mahany Defendants contains a choice of law clause. It states that performance under the agreement is governed by "laws of the state of Wisconsin and the

---

[4] Dietz argues that because he was brought into the case after the transfer, the case against him was never transferred. *See* Dietz Reply at 4. Accordingly, he argues, the Court should apply New York's choice of law rules as to the statutes of limitations and claims against him. *Id.* Dietz does not cite authority for this theory, which he raises for the first time on reply. "It is well established, of course, that arguments first raised in reply briefs are forfeited or waived." *Chevron Corp. v. Donziger*, 325 F. Supp. 3d 371, 379 n.21 (S.D.N.Y. 2018); *see also Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) (collecting cases), *aff'd*, 159 F.3d 1347 (2d Cir. 1998).

regulations governing attorneys practicing in Wisconsin, as promulgated by the Supreme Court of Wisconsin" and the "multijurisdictional rules of practice of the American Bar Association." Aug. Ltr. at 4 (designating Wisconsin law as law governing performance); *see also* Oct. Ltr. (modifying contract but not choice of law provision); Jan. Email (same); Transfer Order at 3–4. Wisconsin courts generally honor choice-of-law provisions, as parties are "free to choose the law governing their contracts," provided that the parties do not "use their freedom to escape important public policies of a state whose law would be applicable if the parties' choice of law provision were disregarded." *Am. Fam. Mut. Ins. Co. v. Cintas Corp. No. 2*, 914 N.W.2d 76, 82 (Wis. 2018) (cleaned up). No party argues that such a public policy exception applies or that another state's substantive law applies. And the Transfer Order contemplated that, based on the choice-of-law provision in the August Letter, this Court would apply Wisconsin law. *See* Transfer Order at 4–5. Accordingly, Wisconsin substantive law applies to the contract and unjust enrichment claims. Under such law, claims sounding in contract and quasi-contract (such as unjust enrichment) are subject to a six-year statute of limitations. *See* Wis. Stat. § 893.43; *Stapel v. Stapel*, No. 09 AP 1195, 2010 WL 2757237, at *6 (Wis. Ct. App. July 14, 2010) ("As a claim based on quasi-contract, a claim for unjust enrichment is subject to the six-year statute of limitations set forth in Wis. Stat. § 893.43.").[5]

With respect to the breach of fiduciary duty and professional negligence claims, both arise from defendants' attorney-client relationship with Abdou. At all relevant times, the

---

[5] In their motions to dismiss, Dietz and Bird argue that New York's statute of limitations should apply because New York is the forum state. *See* Dietz Mem. at 5–6; Bird Mem. at 12–13. But that argument ignores that, because the case was transferred under § 1404(a), the Court must apply Wisconsin's choice of law rules as to statutes of limitations. Neither Dietz nor Bird has explained why Wisconsin would elect not to apply its own statutes of limitations to Abdou's claims.

Mahany Firm was organized under the laws of Wisconsin. SAC ¶¶ 20–21. The parties' original retention agreement, the August Letter, explicitly contemplates the application of "regulations governing attorneys practicing in Wisconsin, as promulgated by the Supreme Court of Wisconsin" to the defendants' performance under the retention agreement. Aug. Ltr. at 4. And the parties do not contest that Wisconsin substantive law applies to the breach of fiduciary duty and professional negligence claims. Defendants thus apply such law in their respective motions to dismiss. *See* Mahany Mem. at 19, 24; Bird Mem. at 16–17; *see also* Dietz Mem. at 6 n.2 (assuming the Court will apply Wisconsin substantive law), 7, 11. The statute of limitations for breach of fiduciary duty claims under Wisconsin law is three years. *See* Wis. Stat. § 893.57; *see also Beloit Liquidating Tr. v. Grade*, 677 N.W.2d 298, 311 (Wis. 2004) (applying prior version of Wis. Stat. § 893.57 to breach of fiduciary duty claim because "a breach of fiduciary duty claim involves an intentional tort").

With respect to professional negligence (*i.e.*, legal malpractice) claims, the statute of limitations under Wisconsin law is three years. *See* Wis. Stat. § 893.53; *see also Gen. Accident Ins. Co. of Am. v. Schoendorf & Sorgi*, 549 N.W.2d 429, 434 (Wis. 1996) (applying prior version of section 893.53 to professional negligence claim); *Buerger v. Ellis*, 740 F. App'x 500, 500 (7th Cir. 2018) (same). However, as Abdou notes, before an amendment which took effect in April 2018, section 893.53 had provided for a six-year statute of limitations for professional negligence claims. *See Buerger*, 740 F. App'x at 500 & n.1. Courts that have examined that amendment have found it not retroactive, such that claims that accrued before April 2018 were subject to the six-year statute of limitations. *See, e.g.*, *Dettlaff v. Boss*, No. 18 Civ. 1620 (PP), 2021 WL 977075, at *5 & n.1 (E.D. Wis. Mar. 16, 2021); *Henderson v. Jess*, No. 18 Civ. 713 (JDP), 2021 WL 689098, at *3 (W.D. Wis. Feb. 23, 2021); *Olrich v. City of Kenosha*, No. 18

Civ. 1981 (PP), 2019 WL 3457978, at *4 (E.D. Wis. July 30, 2019), *aff'd sub nom. Olrich v. Kenosha County*, 825 F. App'x 397 (7th Cir. 2020).  Accordingly, because all of the conduct at issue in Abdou's professional negligence claim occurred before the April 2018 amendment, Abdou's claim is subject to a six-year statute of limitations.

### B.     Reasonableness of Defendants' Fees in Light of Work Performed

Five of Abdou's claims are based on the theory that defendants' fees were unreasonable and excessive in light of the work performed: (1) breach of fiduciary duty against all defendants; (2) professional negligence against all defendants; (3) breach of contract against the Mahany Defendants; (4) unjust enrichment against Mahany, Bird, and Dietz (together, the "individual defendants"); and (5) a request for relief under the Court's "inherent power" to modify the contingency agreement.  The gravamen of these claims is that the one-third contingency fee collected by the firm, amounting to $16 million, from which the firm later accorded Abdou a $375,000 discount, was unreasonable and excessive in light of the work performed.

Contingency agreements are enforceable in Wisconsin.  They "play a vital role in ensuring that certain claimants get access to the courts by providing attorneys with a sufficient incentive that outweighs the risks of litigating uncertain claims."  *Anderson v. MSI Preferred Ins. Co.*, 697 N.W.2d 73, 85 (Wis. 2005); *see also id.* at 87 (Bradley, J. concurring) (contingency fees serve "a gatekeeping function" and prevent cases with little merit from being brought due to the low risk of recovery).

Notwithstanding their enforceability, contingency fees must still be reasonable under the circumstances.  *See Hutterli v. State Conservation Comm'n*, 148 N.W.2d 849, 852 (Wis. 1967) ("Thus, a contingent fee agreement is only a guide, but not a control on the question of a reasonable fee.").  Courts have "inherent power to determine the reasonableness of attorneys' fees and to refuse to enforce any contract that calls for clearly excessive or unreasonable fees."

*Herro, McAndrews & Porter, S. C. v. Gerhardt*, 214 N.W.2d 401, 402 (Wis. 1974), *modified on*

*other grounds by Standard Theatres, Inc. v. Wis. State, Dep't of Transp., Div. of Highways*, 349

N.W.2d 661, 670 (Wis. 1984). This inherent power "may be exercised either during the action

from which the charges for attorney's fees emanates or in a subsequent suit on that contract for

attorney's services." *Id.* at 403; *see Maynard Steel Casting Co. v. Sheedy*, 746 N.W.2d 816, 817,

821–24 (Wis. Ct. App. 2008) (in subsequent lawsuit for disgorgement of fees, holding that trial

court had properly exercised its inherent authority over fee arrangements, upholding finding that

fees had been unreasonable, ordering disgorgement, and applying ABA Rule 1.5(a) factors in

reducing the award).[6]

In this subsequent lawsuit, Abdou brings contractual and other claims to reclaim the fees

he paid to the Mahany Firm in 2014 and 2015. Unreasonable and excessive fees are prohibited

by ABA Rule 1.5 ("ABA Rule 1.5") and Wisconsin Rule of Professional Conduct 20:1.5(a)

("Wis. Rule 20:1.5") (adopted by the Supreme Court of Wisconsin), both of which the August

Letter incorporates by reference. *See* Aug. Ltr. at 4.

The texts of ABA Rule 1.5(a) and Wisconsin Rule 20:1.5(a) are identical:

> A lawyer shall not make an agreement for, charge, or collect an unreasonable fee
> or an unreasonable amount for expenses. The factors to be considered in
> determining the reasonableness of a fee include the following:

---

[6] Whether the Court has inherent authority to determine the reasonableness of attorneys' fees is separate from whether it has subject-matter jurisdiction. Bird argues that because this Court did not preside over the FCA settlement, it lacks such jurisdiction. *See* Bird Reply at 9. In arguing that the court that oversaw an FCA action has exclusive jurisdiction over a post-settlement fee dispute, Bird relies on *United States ex rel. DePace v. Cooper Health Systems* ("*DePace*"), 940 F. Supp. 2d 208 (D.N.J. 2013). But *DePace* did not hold that the settlement court had *exclusive* jurisdiction over fee disputes. It held that, despite the lack of complete diversity among the parties, the court had subject-matter jurisdiction to address this question based on its ancillary jurisdiction over disputes regarding attorneys' fees and costs. *See id.* at 211–14. Here, the parties are fully diverse, supplying diversity jurisdiction, making the lack of ancillary jurisdiction irrelevant.

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

Although these rules were "designed to govern the ethical obligation of attorneys to charge reasonable fees," the Wisconsin Supreme Court has "endorsed the factors set out in [Wisconsin Rule] 20:1.5 and encourages courts to apply these factors when they are required to determine or evaluate attorney fees." *Kolupar v. Wilde Pontiac Cadillac, Inc.*, 683 N.W.2d 58, 66 (Wis. 2004).

The Mahany Defendants argue that a one-third contingency fee is presumptively reasonable under Wisconsin Statute § 814.045, which provides that "[i]n any action in which compensatory damages are awarded, the court shall presume that reasonable attorney fees do not exceed 3 times the amount of the compensatory damages awarded . . . ." Wis. Stat. § 814.045(2)(a). It is, however, not clear whether and to what extent this presumption applies in a *qui tam* action such as this, in which the plaintiff's award is not compensatory in nature. *Cf. Brooks v. United States*, 383 F.3d 521, 524–25 (6th Cir. 2004) (relator's share awarded under 21 U.S.C. § 3730(d) does not provide compensation for injuries suffered by the *qui tam* plaintiff and therefore is taxable income). And, as Abdou notes, even if a presumption applied, the rote application of

section 814.045(2)(a) to such suits could result in upholding fees that were absurdly unreasonable in size. *See* Opp'n to Mahany MTD at 10–11.

Abdou, for his part, argues that the one-third contingency fee was unreasonable as applied to his case because the Mahany Firm "performed almost no substantive legal work" on Abdou's *qui tam* action. SAC ¶ 8. The SAC alleges that defendants left Abdou to draft his own *qui tam* complaint, assist DOJ with drafting subpoenas for the Bank, and perform his own legal research as to whether his FCA claims were outside the statute of limitations. *Id.* ¶¶ 9, 43, 45–46, 53–55. The SAC further alleges that, after the complaint was filed, defendants did not work on Abdou's FCA claim, and engaged in limited (and reluctant) negotiation with DOJ as to Abdou's relator fee, ultimately forcing Abdou to conduct his own legal research as to his entitlement to a higher relator's fee. *Id.* ¶¶ 12–13, 51, 57–59. To be sure, defendants forcefully deny these allegations. *See, e.g.*, Mahany Mem. at 8, 16, 30; Bird Mem. at 2 & n.1. But, at the motion to dismiss stage, the Court must treat such well-pleaded facts as true and draw all reasonable inferences in favor of Abdou, the non-moving party. Accepting Abdou's allegations as true, including that defendants did negligible work and left Abdou to effectively lawyer on his own behalf *en route* to pocketing a $16 million award, Abdou has adequately pled that the one-third fee, measured against the standards of ABA Rule 1.5(a) and Wisconsin Rule 20:1.5(a), was unreasonable.

In pursuing dismissal, defendants point to cases in which contingency agreements for up to 40% of the plaintiff's award were held reasonable (or at least, not *per se* unreasonable). In each, however, the reviewing court had the benefit of a record establishing the nature and extent of counsel's legal work and performance. *See, e.g.*, *Markwardt v. Zurich Am. Ins. Co.*, 724 N.W.2d 669, 681–82 (Wis. Ct. App. 2006) (summary judgment decision); *Kluenker v. State,*

*Dep't of Transp.*, 327 N.W.2d 145, 149–50 (Wis. Ct. App. 1982) (appeal of post-trial judgment). Here, at the motion to dismiss stage, the Court lacks any such record. No such record has yet been built here. For much the same reason, *DePace, see supra*, n.6, on which defendants rely, is distinguishable. It was decided on a motion to reopen filed by the relator to resolve a dispute over his obligations under his contingency agreement with respect to his attorneys in light of the settlement, which provided for a fee award. 940 F. Supp. 2d at 211. The court found the 30% contingency fee collected by the relator's FCA counsel reasonable in light of: (1) "numerous affidavits from prominent *qui tam* lawyers who assert[ed] that fee agreements like the one at issue in this case are typical in *qui tam* litigation under the [FCA]"; (2) the standard practice for *qui tam* lawyers to receive both a contingency fee and a statutory fee award from the losing party; and (3) the risk that the *qui tam* counsel took on by litigating the case for five years, with no guarantee of payment, before the Government intervened. *Id.* at 218; *see also id.* at 218 n.4 (finding that all eight factors articulated in ABA Rule 1.5(a) favored the award requested by *qui tam* counsel). Again, on the pleadings, there is no comparable record here.

The only other two FCA fee cases that defendants cite are inapposite. In *United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.*, 793 F. Supp. 2d 1260 (D. Colo. 2011), the court examined whether the losing defendant was obligated to pay more than $2 million in statutory fees on top of the plaintiff's attorneys' contingency agreement for 55%. *Id.* at 1264. The *Maxwell* court held that the statutory award was irrelevant to the fee award. *Id.* at 1264–65. The court did not, however, opine on the reasonableness of the 55% contingency agreement. On the contrary, it noted that "[w]hether Maxwell's attorneys will enforce their right to collect both the contingent fee as well as a statutory award, reduce it or waive it altogether is beyond the purview of the issues before the Court." *Id.* at 1265. As for the other case the defendants cite, *United*

*States v. United States ex rel. Thornton*, it involved a challenge by the relator to the calculation of his share of the FCA settlement, which he argued should include the value of claims against the Government that defendants released as a part of the FCA settlement. 207 F.3d 769, 771–72 (5th Cir. 2000). The court held that "a district court is free to advise the relator that the total value of the settlement will be determined when the court ascertains the fairness of the settlement, and that the relator must raise any objections at the fairness hearing." *Id.* at 772. But in addressing this procedural point, it did not address the issues of reasonableness implicated here.

In a separate challenge to the SAC, Bird and Dietz argue that Abdou's complaint is effectively a motion for relief from a final judgment under Federal Rule of Civil Procedure 60(b) and therefore is untimely. *See* Fed. R. Civ. P. 60(c)(1) ("A motion under Rule 60(b) must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding."). They note that the Relator Settlement between Abdou and DOJ was entered on December 15, 2014. *See* SAC ¶ 64; *see also* Relator Settlement. But the Relator Settlement released all claims between DOJ and Abdou, his attorneys, his agents, and his heirs and assigns. Relator Settlement ¶ 4. By its text, it does not purport to release all claims between Abdou and his attorneys or agents.

Finally, the Mahany Defendants argue that the breach of fiduciary duty claim, insofar as it is based on the unreasonableness of the fee, is untimely, as it accrued on December 29, 2014, when the Mahany Firm collected its contingency fee, and Abdou filed this action well after the three-year statute of limitations on that claim had run. *See* Mahany Reply at 7 (citing SAC ¶ 65); *see also Beloit*, 677 N.W.2d at 311. Abdou counters that the discovery rule tolled his claims until Bird filed his Rule 12(b)(7) motion, which disclosed that Mahany received $5,208,333.34

of that fee. *See* Opp'n to Mahany MTD at 20. The discovery rule provides that tort claims do not accrue until "the date the injury is discovered or with reasonable diligence should be discovered, whichever occurs first." *Doe v. Archdiocese of Milwaukee*, 700 N.W.2d 180, 188 (Wis. 2005) (cleaned up). "The cause of injury does not accrue until the plaintiff discovers both the nature of his injury and the cause of his injury." *Id.*

As to this discrete point, the Mahany Defendants are correct. Abdou acknowledges that, after the order dismissing the FCA case was entered on December 15, 2014, $15.625 million was disbursed to the Mahany Firm. SAC ¶¶ 64–65. Although Abdou may not have known until recently the specific amounts thereafter distributed to the individual defendants, as of that date, he was aware of the total amount of his attorneys' award, which he now claims is unreasonable. The elements of a claim for breach of fiduciary duty are: "(1) the defendant owes a fiduciary duty to the plaintiff, (2) the defendant breached that duty, and (3) the defendant's breach of the duty caused the plaintiff's damages." *Est. of Sheppard ex rel. McMorrow v. Specht*, 824 N.W.2d 907, 910 (Wis. Ct. App. 2012). The SAC does not allege any independent harm to Abdou caused by the individual disbursements from within that award to Mahany, Bird, and Dietz. Accordingly, the discovery rule has no bearing on this case, as Abdou did not discover anything relevant after December 2014. Abdou's breach of fiduciary duty claims predicated on the unreasonableness of defendants' fees must be dismissed. *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) ("While complaints typically do not address affirmative defenses, the statute of limitations may be raised in a motion to dismiss if the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." (cleaned up)).

The remaining claims, based on the asserted unreasonableness of the contingency fee award, are, however, timely. Accordingly, Abdou may challenge that award based on, in the

alternative, theories of professional negligence,[7] breach of contract, and unjust enrichment,[8] and

seek relief from this award under the Court's inherent authority. Should multiple such claims

prevail on this theory, however, Abdou of course may recover only once, as "it goes without

saying that the courts can and should preclude double recovery." *EEOC v. Waffle House, Inc.*,

534 U.S. 279, 297 (2002) (cleaned up).

### C.   Negotiation and Modification of the Retention Agreements

Abdou also seeks to recover damages on theories related to the formation, renegotiation,

and modifications of his contingency agreements with the Mahany Firm. He brings claims on

such theories of (1) breach of fiduciary duty; (2) professional negligence; and (3) breach of

contract. For the following reasons, the Court dismisses these claims.

---

[7] "Legal malpractice claims may give rise to either a tort claim or a contract claim." *Doering v. Kaufman*, No. 97-750, 1997 WL 525299, at *2 (Wis. Ct. App. Aug. 27, 1997). "A tort claim arises from a breach of the attorney's common-law duty, whereas a contract claim arises from a breach of duty created by a contractual agreement between the attorney and the client." *Id.* Bird argues that Abdou's professional negligence claim sounds in contract rather than tort and therefore, because Bird is not in contractual privity with Abdou, this claim must be dismissed against him. *See* Bird Mem. at 11. Abdou contends that the claim turns on whether defendants breached their common-law duty not to charge unreasonable fees, a duty not solely created by the agreement. *See* Opp'n to Bird MTD at 10. Bird does not cite caselaw holding that the duty to charge a reasonable fee is one that "arises from the agreements or contracts and not the common law." Bird Mem. at 11. Accordingly, the Court holds with Abdou on this point.

[8] Bird and Dietz argue that the unjust enrichment claim, brought against only the individual defendants, must be dismissed because Abdou directly conferred a benefit only on the Mahany Firm, not on any individual. *See* Bird Mem. at 19; Dietz Mem. at 14. However, both cases cited by Bird and Dietz are product liability cases in which the plaintiff conferred a benefit on the third-party seller, not the manufacturer of the product. *See Blitz v. Monsanto Co.*, 317 F. Supp. 3d 1042 (W.D. Wis. 2018); *Karnes v. C. R. Bard, Inc.*, No. 18 Civ. 931 (WMC), 2019 WL 1639807 (W.D. Wis. Apr. 16, 2019). Based on the fiduciary relationship between Abdou and the individual defendants, these cases are not instructive analogues. The Court will reserve on the question of whether the disbursement of fees to the individual defendants constitutes a "benefit" conferred from Abdou on the individual defendants.

### 1. Breach of Fiduciary Duty

Abdou's fiduciary duty claim, against all defendants, alleges that defendants breached such duties by: (1) failing to give him full and accurate information about the representation and the terms of the retention agreements; (2) failing to inform him of his right to have independent counsel review the contingency agreement; (3) actively discouraging him from seeking advice from independent counsel; and (4) including unfair terms in the retention agreements.

As explained, the statute of limitations for a breach of fiduciary duty claim in Wisconsin is three years. *See* Wis. Stat. § 893.57. The last retention agreement the parties signed, before Abdou terminated the Mahany Firm, was the May Letter, dated May 8, 2015. Accordingly, any claims based on defendants' failure to provide Abdou with information before he accepted each agreement or on the inclusion of certain provisions in it accrued, at the latest, on May 8, 2018. Any breach of fiduciary duty claims based on the negotiation, formation, or modification of these agreements are, therefore, untimely, insofar as Abdou filed this suit on October 10, 2018. Abdou does not argue otherwise. He defends as timely only that aspect of his breach of fiduciary duty claims based on the allegedly unreasonable and excessive fee that defendants collected, on the theory, which the Court has rejected, that that claim should be tolled until the point at which Abdou learned of the allocation of that fee among the individual defendants. *See* Opp'n to Mahany MTD at 20; Opp'n to Bird MTD at 18; *see also supra* pp. 21–22. He does not defend the timeliness of the fiduciary duty claim on any other theory.

In any event, for the following reasons, the SAC's fiduciary duty claims based on the formation and modification of the retention agreements are not only untimely—they also fail to plead facts sufficient to state a claim of breach of such duties.

### a. *Full and Accurate Information Regarding the Retention Agreements*

The SAC alleges that defendants breached their fiduciary duties by "entering into retention agreements with [Abdou] without explaining the terms so that [Abdou] fully knew and understood them." SAC ¶ 81; Opp'n to Mahany MTD at 12. Wisconsin Rule 20:1.5(c) articulates the obligations on attorneys entering into contingency agreements:

> A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by par. (d) or other law. A contingent fee agreement shall be in a writing signed by the client, and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal; litigation and other expenses to be deducted from the recovery; and whether such expenses are to be deducted before or after the contingent fee is calculated. The agreement must clearly notify the client of any expenses for which the client will be liable whether or not the client is the prevailing party. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and if there is a recovery, showing the remittance to the client and the method of its determination.

Critically, the SAC does not allege that any of the retention agreements failed to comply with any of these requirements. Nor does the Court's review of the August Letter, October Letter, or January Email reveal any such deficiencies. And Abdou does not point to authority supporting his notion that, apart from furnishing him with a written retention agreement compliant with the above obligations, defendants were obliged to verbally explain each term to him. Notably, too, the SAC does not allege that defendants provided Abdou with inaccurate information regarding the retention agreements, or that any terms themselves were opaque or ambiguous so as not to be reasonably understandable. Nor does Abdou allege damages from the breach of the purported duty to verbally explain defendants' ethical obligations to him.

### b. *Right to Independent Counsel*

The SAC next alleges that the defendants breached their fiduciary duty to advise Abdou of his right to have the retention agreements reviewed by independent counsel. *See* SAC ¶ 81.

But Wisconsin Rule 20:1.5(c) does not require such a disclosure for contingency agreements, and Abdou does not point to any other authority so holding.

The SAC further alleges that the defendants breached their fiduciary duties by "actively discouraging Mr. Abdou from seeking" advice from independent counsel. *Id.* In support of this claim, Abdou points to the August Letter, which stated:

> We have advised you that while being investigated by the government and while under court seal, you may not discuss this case with others. (You may always cooperate with federal authorities but the court's sealing order has an impact on unemployment claims – please discuss any disclosures beforehand with us.) We have also advised you that although filed under seal, ultimately a case is unsealed and that at some future date, Bank of America will likely know that you were the one bringing the claim for a violation of the false claims act.

Aug. Ltr. at 4; *see also* SAC ¶ 41. This provision, however, does not state what Abdou claims it states. Fairly read, it advises Abdou not to waive attorney-client privilege or reveal information to third parties while the *qui tam* case was under seal. The SAC similarly alleges that defendants "orally" advised Abdou that he "may not discuss the case with others." SAC ¶ 41. But the SAC does not allege any other context in which defendants allegedly deterred Abdou from consulting separate counsel. It does not allege, for example, that Abdou ever asked to have independent counsel review the agreement and was discouraged from doing so, or even raised the subject. As to this theory, Abdou also does not allege any damages—separate from his claim related to the reasonableness of the Mahany Firm's fee—flowing from the ostensible breach he asserts.

### c.    Unfair and Unreasonable Terms

Finally, the SAC alleges that by including the following four "unfair and unreasonable" terms in the retention agreements, defendants breached their fiduciary duties to Abdou:

> (a) the provision in the August Letter that permitted Defendants to recover a contingency fee of 40% for Mr. Abdou's claims under the FCA;

> (b) the provisions in the August Letter that permitted Defendants to withdraw from representation at any time, in their discretion, but precluded Mr. Abdou from

terminating the attorney-client relationship without paying their attorneys' fees, unless he had "just cause";

(c) the provision in the January Email stating that Defendants would be entitled to a 33 1/3% recovery on the FIRREA and FCA claims; and

(d) the provision in the May Letter stating that Defendants had the "right" to "renegotiate" any agreed-upon attorneys' fees to obtain "a larger percentage."

SAC ¶¶ 78–85.

The SAC does not allege facts sufficient to make plausible a claim for breach of fiduciary duty based on these provisions. Abdou labels each provision "unfair and unreasonable," but "conclusory, *ipse dixit* assertions are insufficient to satisfy the pleading standards" of *Twombly* and *Iqbal*. *Fried v. LVI Servs., Inc.*, No. 10 Civ. 9308 (JSR), 2011 WL 2119748, at *5 (S.D.N.Y. May 23, 2011). Nor does it allege damages from these provisions that are not encompassed by his breach of fiduciary duty claim based on the size of the fee defendants collected.

As to the first provision, Abdou does not point to any case holding that a 40% contingency fee is *per se* unreasonable and excessive. *Cf. Kluenker*, 327 N.W.2d at 149 (upholding 40% contingency fee). Accordingly, while a fee of such size could prove unenforceable depending on the circumstances, the mere inclusion of such a contingency fee in a retention agreement cannot constitute a breach of fiduciary duty. And here, given that this provision was later overtaken, Abdou cannot claim to have been damaged by it.

As to the second, Abdou argues that this provision gave defendants an "escape hatch" permitting them to take on the representation with no risk. Opp'n to Mahany MTD at 25; *see also* SAC ¶¶ 5–6. That misrepresents the August Letter. It permitted the Mahany Firm to end its representation (1) if the firm determined after investigation that were "no viable claims"; or (2) if "after an unfavorable investigation by the federal government," the case was not "economically viable." Aug. Ltr. at 3–4. In either event, Abdou "would not be obligated for any attorneys' fees

or costs." *Id.* at 4.  The letter also permitted the firm to withdraw "if in the firm's judgment, continued representation is impossible, inadvisable or if [Abdou] asked [defendants] to do something illegal or unethical." *Id.*  This provision does not affirmatively state that Abdou was required to pay any fees in the event of such a withdrawal.  Abdou paints these provisions as allowing defendants to "walk away from the representation unscathed if the government chose not to intervene."  Opp'n to Mahany MTD at 25.  But in those circumstances, defendants would have lost the value of the time they had worked—the agreement does not give them the right to pursue Abdou for such fees.  And the August Letter stated that, before withdrawing in the event the Government chose not to pursue a case, defendants would "discuss next steps" with Abdou. Aug. Ltr. at 4.  Abdou does not cite any authority under which such a provision amounts to a breach of fiduciary duty.  And the SAC does not allege any damage to Abdou from the inclusion of these provisions.

As to the third, drawn from the January Email, it entitles the Mahany Firm to one third of Abdou's recovery under either FCA or FIRREA.  Abdou does not cite any authority that such a provision is *per se* unreasonable, or a breach of fiduciary duty, at the time of signing.  The Court has separately reviewed Abdou's claims that the firm's ultimate receipt of a one-third fee (less $375,000) was unlawful, and while holding that Abdou's fiduciary duty claim to this effect was untimely, the Court has sustained as viably pled Abdou's other claims challenging this fee.

Finally, Abdou argues that the May Letter provision allowing defendants to "renegotiate" any agreed-upon attorneys' fees to obtain "a larger percentage" was a breach of fiduciary duty. Abdou mischaracterizes the May Letter.  SAC ¶ 82.  It stated that defendants' representation would last "until a verdict after a trial, settlement or upon a final order of dismissal by the court." May Ltr. at 5.  And, it stated, were additional proceedings required, the firm could either cease

representing Abdou, or it would "be entitled to may [sic] renegotiate this agreement and request a larger percentage of any recovery." *Id.* This provision did not entitle to defendants to a higher fee, but merely enabled the firm to request a larger percentage of recovery in the event that the case required work beyond the scope that the May Letter anticipated. This precatory provision did not breach any duty. In any event, because Abdou terminated defendants' representation before any litigation under the May Letter ensued, SAC ¶ 77, he has not alleged any damages from this provision.

### 2. Professional Negligence

Abdou's professional negligence claim largely reprises the allegations in his fiduciary duty claims. Unlike those claims, however, claims for professional negligence that accrued before April 2018 are subject to a six-year statute of limitations. As such, they are not untimely. The SAC, however, fails to plausibly plead legal malpractice.

Under Wisconsin law, the elements of a legal malpractice claim are "substantially the same as the elements comprising a general negligence claim. The plaintiff must prove: (1) an attorney-client relationship existed; (2) the attorney's actions were negligent; (3) the attorney's negligent actions caused the client's injury; and (4) the client suffered an actual injury." *Skindzelewski v. Smith*, 944 N.W.2d 575, 579 (Wis. 2020). To the considerable extent that this claim rests on the same allegations as Abdou's breach of fiduciary duty claim, it fails for the same reasons. Abdou has not pled facts to plausibly support that defendants breached any duty in connection with the negotiation and modification of the retention agreements. He therefore has not pled that defendants' representation "fail[ed] to meet the level of competence necessary for effective representation." *State ex rel. Fiedler v. Wis. Senate*, 454 N.W.2d 770, 773 (Wis. 1990). And, while he has adequately pled that defendants' limited work on the matter made their fee unreasonable, he has not pled concrete facts to support that more or more competent legal

work by defendants would have yielded a larger recovery and contingency award, and thus he has not pled the element of damages as to this theory, either.

### 3. Breach of the October Letter

Count V of the SAC alleges that the Mahany Defendants breached the October Letter by collecting a one-third contingency fee, rather than a 33% contingency fee. *See* SAC ¶¶ 107–12. The October Letter reduced defendants' contingency fee as to FIRREA claims from 40% to 33%. Abdou, however, ultimately recovered only under his FCA claim, SAC ¶¶ 42, 54–55, not under any FIRREA claim. Accordingly, this claim does not state a breach of the October Letter.

Abdou argues that "disputes of fact as to the terms of the Agreement" preclude dismissal of this claim. Opp'n to Mahany MTD at 16. This appears to refer to the SAC's allegation that "[p]ursuant to the October Letter, the Mahany Defendants contracted to reduce their contingency fees on Mr. Abdou's recovery to 33%." SAC ¶ 109. But that allegation is expressly contradicted by the terms of the October Letter itself, which states that the parties "agreed to amend the contingent fee as to the FIRREA (Financial Institutions Reform Recovery and Enforcement Act) claim." Oct. Ltr. Accordingly, this claim must be dismissed.

However, the SAC also alleges that Bird and Abdou reached an oral agreement for a 33% fee for the FCA claim, and that Bird later sent the January Email confirming those terms. SAC ¶ 48. To the extent that Count V was intended to refer to a breach of that oral agreement or of the January Email, the Court will permit Abdou to file, within two weeks of the date of this opinion and order, an amended SAC reforming this claim only.

### D. Negotiation of the Relator Settlement

Finally, Count II of the SAC brings a claim for breach of fiduciary duty in connection with defendants' acceptance of DOJ's offer to him of a 16% relator's share. *See* SAC ¶¶ 86–92. The SAC alleges that the Mahany Defendants and Bird violated ABA Rule 1.2 and Wisconsin

30

Rule 20:1.2(a) by advising Abdou to accept an award of this size, *see id.* ¶¶ 89–90, and by accepting that offer without, as Abdou claims he instructed, first attempting to discover whether refusal of this offer would destroy all prospect of settlement, *see id.* ¶¶ 13, 90.

This claim is barred by the statute of limitations, and Abdou does not defend it as timely. *See* Opp'n to Mahany MTD at 18–21 (arguing for timeliness of other claims but not Count II). This claim accrued, at the latest, on the day that Abdou executed the Relator Settlement: December 15, 2014. *See* SAC ¶ 64; *see also* Relator Settlement. The statute of limitations therefore expired on December 15, 2017, some 10 months before Abdou filed suit.

## IV.     Dismissal with Prejudice

Except as to Abdou's breach of contract claim regarding the October Letter, which the Court will permit limited leave to amend as outlined above, the Court's dismissals of claims herein are with prejudice. Abdou has had two opportunities to amend his complaint, including once after the Mahany Defendants and Bird had moved to dismiss. *See* Dkts. 51, 52, 54, 57. And Abdou has not sought leave to amend the SAC a third time. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 506 (2d Cir. 2014) (upholding dismissal of amended complaint with prejudice where, "following Defendant's first motion to dismiss for failure to state a claim," plaintiff had already amended its complaint once and failed to "resolve its pleading deficiencies in its First Amended Complaint"); *Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison L.L.P.*, 351 F. App'x 472, 474 (2d Cir. 2009) (summary order) (district court did not abuse discretion by dismissing with prejudice where plaintiff "did not move for leave to replead in opposition to [defendant's] motion to dismiss his original complaint with prejudice").

## CONCLUSION

For the forgoing reasons, the Court grants in part and denies in part defendants' respective motions. The Court denies the motion as to Abdou's claims of breach of contract,

professional negligence, unjust enrichment, and request for relief under the Court's inherent power to the extent that these claims challenge the reasonableness of defendants' contingency fee. The Court grants the motion to dismiss Count V (breach of the October Letter), but authorizes Abdou to move for leave to amend that count within two weeks of this order; should Abdou fail to so move by then, the dismissal will be with prejudice. The Court dismisses all other claims with prejudice.

The Clerk of Court is respectfully directed to terminate the motions pending at 51, 52, 81, 83, and 96, and to lift the stay on discovery in this case. The parties are instructed to submit, within two weeks of the date of this opinion and order, a joint letter identifying what discovery remains in the case and proposing a schedule to complete that discovery.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: June 28, 2021
      New York, New York